If it please the court, counsel, my name is Denise Jarman. I am representing the children of Mercedes Patoc, appellant in this case. Could I ask you one or two preliminary questions? Do you have a policy with Lexington? No. We have a portion of the policy, which was a package policy that had both general liability and automobile liability coverages, and we are not certain that the portions that we have are the automobile liability portions because they refer to occurrence language rather than accident language, which is the traditional automobile liability coverage. Well, when you sued them the first time, what did you have then? It was not actually the firm that I am with that sued them the first time, and the materials that we received from them don't have the policy there. The best we have is a portion of the policy and an e-mail in-house with Lexington showing that they're not sure they have the complete policy. If you don't have the policy, how can you make allegations about what it says? Because I know, Your Honor, that in these cases, there are – there have to be per-person and per-accident limits, and we have the declarations page, which shows that. We have a portion of the policy which also shows there are no per-accident limits on the policy. I just don't have a complete copy of the policy to know for certain that what is referred to on the deck sheet as occurrence limits are what they're talking about in the automobile liability portion, because frequently you'll see the common deck sheet for all parts of the package policy, and then you'll see a deck sheet for the individual portions, the automobile liability and the occurrence. But we know from the language of the – we know from the language of the portion of the policy that we have that there are no per-accident limits. Well, given the complexity of insurance policies, they only have a fragment. And you didn't attach that to your complaint, which you did have. We did not, because it was an incomplete portion of the policy, and because based on what – every insurer has to file their policy forms with the various departments of insurance, so that Lexington, in order to write this policy, would have to file that with the Department of Insurance. So it's not a great leap for me to know what's on file with the Department of Insurance in order to make the basic allegations of the complaint before we get the copy of the policy. What efforts have you – I understand that your clients were not the insured. The insured was the van company or the transport company. I understand that. Have you asked Lexington for a copy of the policy? Yes, we did. And their response has – you can obviously respond in a moment, What we got back were the portions of the policy plus the copy of the e-mail that is part of the excerpt of record here. And did they say – and I guess Lexington can also respond in a moment – but did they say, we don't know what the actual policy was, here's our best guess? I mean, why did they only give you a portion? I don't know. I see. We did do – from pro-transportation, we were able to get an authorization for release of Lexington's files before we filed. And so what we attached in the record was that what we had from them, it wasn't a complete portion. But I do know, based on filings with the Department of Insurance, that the allegations in the complaint have to be generally accurate, although there may be some – Okay. So you're making your best guess as to what the policy says, not having the policy, not getting it from the transportation company. Did they not have their own policy? They were defunct at the time that – I see. Yeah. So let me make sure I understand. I'm doing my best to understand your argument now based on what you think the policy says. Right. And that is that there's a limitation per person, and that per person limitation means, well, okay, it limits when, in fact, the individual is suing on her own behalf. And there's another quote, per person, when it's not a suit on behalf of the injured individual but is now a suit on behalf of the survivors bringing a wrongful death. And therefore, per person limits separately two different kinds of lawsuits. That's the argument, right? Yes, Your Honor. The argument is essentially from – in FIBAS, this Court did a very good job of looking at the policy language of the per person limits and distinguishing two different sets of cases. There's the Warner and Ball line of cases, and there's the Avalon line of cases. And in the Warner and Ball line of cases, the language of the per person limit read, for the purposes of this provision, the bodily injury sustained by one person as used herein shall be deemed to include all injury sustained by others as a consequence of such bodily injury. That, in the Warner and Ball line of cases, was held to aggregate the non-derivative claims with the victim who suffered the bodily injury. By contrast, the language that appears in our complaint and which appears in the Avalon case does not have the aggregation clause that I just read, and it's still read that the limit stated for each person for bodily injury applies to all damages arising from bodily injury, sickness, disease or death. And so the distinction is whether or not there is the presence in the policy of language which aggregates and language which does not aggregate. Now, I understand your theory. I have to say I understand your theory only with some difficulty in reading your brief, and I understand your theory almost not at all from reading your complaint. Can you point me to language in your complaint where you alert both the other side and the district judge in your theory that the per person limitation applies, number one, when the individual is suing on their own suit brought by others? I understand, Your Honor. It's in the excerpt of record at 165. I bet I know the sentence you're going to read to me, and if that's the sentence, I find it incomprehensible. That is written in basic policy language of policies that do not aggregate the non-derivative claims in the derivative claims. And having now had the opportunity to go through the process of the appeal and this, you know, I wish when I did first allege the complaint that I had gone one step further and then the legal conclusion that the per person limits of the Lexington policy do not aggregate the non-derivative claims. And I think that would have made it clearer for the court here. Yes. I mean, I don't know whether you guys don't speak English in the insurance industry, but this is just not. I have been accused of such. Did you ever move to amend your complaint? We asked for leave to amend at the time of the original 12b-6 motion, and it was not granted. At what point after the judge's? At the point where we were opposing the 12b-6 motion. In our opposition, we actually asked for that opportunity. Prior to the judge's decision? Yes. And so this is first amendment complaint? No, this is the original complaint. So there's never been any amended complaint? No. My first shot at it. Is that in the record, your motion to amend? Excuse me? Is it in the record, your motion to amend? Yes, yes. Where? It's on the last page of our opposition to the 12b-6 motion. I also wanted to, I think we've addressed the issue with respect to the aggregation versus the non-aggregation. And the other issue that I wanted to address and I think is relevant is the distinction between the Bagot case that the court found was one accident because the first aid rendered after the accident was part of the same event. And the distinction here of the duty of a medical transporter. And if you're in the care of a medical transporter, even without the absence, I mean, even without the injury that was sustained here by Mercedes Patox with doing the wheelie, that if she'd had something obstruct her throat, if she'd had heart palpitations, if she'd had some problem during transport, the restatement of tort says that they have an independent duty to see that you get medical care. And even apart from the issue of whether the limits were aggregated or not in the Lexington policy, in this case, we alleged the fact that she hit her head, she did not succumb to a coma, and she did not die. Until hours later. And that presents a factual issue as to whether or not we had one or two accidents. And in Bagot, the court had already had the benefit of a trial. They had the facts and the facts were determined. In addition, in Bagot, they were dealing with the per-accident limits, not the per-person limits. And in Bagot, they didn't deal with this issue of what should we do as a matter of public policy when people entrust themselves to medical transporters. Is it appropriate that we impose on those people the duty to see that you're cared for medically while you're in their transport? You know, I've just read your opposition filed in the district court. And sure enough, right there at the very end, you asked for permission to amend. But I don't find any argument that says per-person limitation applies once as to a suit on behalf of the injured, and then again as to a suit on behalf of survivors. You make various arguments about, well, there's no aggregation. You make various arguments about occurrence. You say, well, in fact, there may be two occurrences because, number one, there was the, you know, the falling over in the van and then there was the negligence afterwards. You make those arguments. But I see no argument based upon per-person. I'm trying to figure out. I'm trying to put myself in the position of the district judge. I understand. Whether he had any warning at all as to what your theory now is. I believe that I could have done a much better job in doing that after being going through this exercise. But we did point out to the Court these three things, the three key things, that Lexington's policy per the allegations in our complaint at Excerpt of Record 165 had no per-accident limits, and that the per-person limits did not, did not limit the maximum liability on account of a single bodily injury. And what that means to me from an insurance standpoint is that you can have the per-person with the bodily injury who is limited to the per-person limits, and then it's as if the person holding the non-derivative claim arising from the bodily injury, be it loss of consortium or wrongful death, is like a second person sitting. Well, I understand the theory, but I'm looking for where that theory is in any way articulated in the language that was in front of the district judge. And I agree, Your Honor. I agree. I agree that I could have made that argument much more clearly. But you didn't make it. No, I did make it. How did you make it? Because we said there were no per-person limits that limited the maximum liability for a single bodily injury. Yeah. I mean, that's the sentence that says the automobile liability coverage did not contain any per-person limits limiting the maximum liability for all damages of a bodily injury sustained by any one person in any one automobile actions. That's the sentence that's supposed to alert me to the theory. Yes. Yes. And that is the language from Avalon. Okay. What was the judge White said was unbelievable? He said he used some term like unbelievable, outrageous for one of your arguments. Do you remember that? I'm not sure. I think he was confused that he was confused. It was one of the arguments about there being no limits. Right. I think he was confused. That's just incredible. Right. Is that what he was referring to? In his order, after oral argument, he indicated that it was nonsensical that I would argue that the policy had no limits whatsoever. And did you? I didn't make that argument, no. My guess is that Judge White's language would have stuck in your mind. If plaintiffs are arguing that no limits applies, that is nonsensical. Okay. Why don't we hear from the other side and we'll give you a chance to respond. Good morning, Your Honors. Rosemary Springer on behalf of Appellee Lexington Insurance Company. And if you could please keep your voice up. I'll do my best. Okay. Thank you. All of the auto liability insurers for transportation settled the underlying personal injury claim by Mercedes Paytac for $2 million. A year later, she died. They sought an additional million dollars from the same carriers. The trial court granted Lexington's motion for two reasons. First, the policy was excess of $1 million in underlying coverage and the settlement was for $1 million. So you don't reach the excess layer. The second reason was the court rejected what really was the theme of this case in the trial court, the theory that there were two accidents or two occurrences. The district court said, no, there was one. That meant the underlying coverage was exhausted. And Lexington, who it was. The district court said that where? In the decision. Where did they make the finding? Just based upon the 12B6 motion? What are you talking about? Yes, the 12B6 motion and the allegations. Well, it's not a finding of fact, then, is it? It's just on the basis of what I'm seeing. Failure to state a claim. Failure to state a claim. Okay. Right. Although many of these facts are in the complaint or allegations. Allegations in the complaint. And what I'd like to get to is what was being discussed in Appellant's argument. I have one question, maybe get over all the rest of it. Do you have a copy of the policy? You know, I have a portion of the policy. I think I have what she was describing. I have the general liability policy, which is an excess liability policy, $2 million aggregate, $1 million per occurrence. Who has the policy? I cannot say. What I don't know, what I don't know based on what we have in our files is whether the auto policy is lost or whether we just don't have it from our client. Could you just elaborate a little bit on that? Because we are interested in the actual document. If you don't have the policy, how do you know that you insured it? Well, we have the, I can show you what I have. I have the excess liability policy issued to Pro Transportation, which has $2 million limits, $1 million per occurrence. Let's say you do have the policy. I have that policy. Now, is there some other policy we're talking about? Well, it's all the same policy, but there's different portions. There's a specific auto liability portion, I believe. I don't have that. I thought I did, but when I got the file out today or yesterday, I realized I had what they were describing, which is the excess, the general liability policy. It certainly describes a limit. It describes a $2 million aggregate and a $1 million per occurrence. Now, did she ask you for the policy? I, me personally, no. There was no discovery. You have to appreciate we're dealing with a case that was at the pleading stage. There was one complaint filed. We brought a motion to dismiss based on those allegations. I understand. But oftentimes, somebody will call you up and say, you know, before we file a complaint, can we have a look at the policy? I honestly don't know if they asked or didn't ask. I see. I would like to get. It would be normal before anybody goes to the trouble of filing a complaint that both sides should read the policy, look at the language, figure out whether there's something there before you decide you need to have a fight. It's cheaper. Yeah. I mean, you guys are all the way here, and nobody has yet figured out what the policy says? I'd like to, if I might, address the waiver argument. What waiver argument? The waiver because they don't have the policy? No, the fact that they did not. If the insurance company is not keeping the policy, who was waiving what? I'm going to – I wanted to address their argument about per-person limits and that this was not an argument that they made in the trial. What language are you relying upon? From what document? The complaint. But you admit that the complaint, she didn't have a chance in discovery to go and say to Lexington, give me the whole policy. Does that agree? She didn't have that chance at all.  I agree there was no discovery. I agree there was no discovery. And now, even at this late stage, you say, oh, I don't have the policy? I don't want – It seems to me that if we're going to draw some kind of an inference, and I'm just, you know, an old fact finder from the Bronx, hey, listen, you lose. At this point, I think that the appellate procedure and the appellate record and the plaintiff should mean something. The plaintiff did not make this argument in the trial court. We didn't have the opportunity to consider or look into this per-person limits concept in the trial court, nor did the trial court, nor did the trial judge himself have a chance. There were no such allegations. They did not allege that this policy had per-person limits. They did not allege that we paid per-person limits. I want to read a few of the key allegations of the complaint, which we relied on in making our motion and which the district court relied on in ruling on that motion. So what about the fact that Norma, she would have had a chance to amend? She did not ask to amend to make this argument. What's that? She never asked to amend to make this argument. But to make some argument. There's one throwaway sentence in the opposition where they basically say, if you're going to deny this for any reason, please give us leave to amend. Although they never presented a reason in that opposition that had anything to do with per-person limits as they're now arguing. No one, not us, not the trial judge, had an opportunity to fairly evaluate this argument and decide whether there was something to it because they never made it. In fact, one thing I want to make clear is they agree that the underlying gulf policies did not have per-person limits. They had per-accident limits. This is how they describe the gulf policies. They say they have per-accident limits. And in the complaint they allege the gulf policy did not contain any per-person limits limiting the maximum liability for all damages for bodily injury sustained by any one person in any one accident. That's at page 162 of the record. That's how they describe a policy that they admit had no per-person limits. That's how they describe our policy in the complaint. That's verbatim. It's the same sentence. Verbatim. Verbatim. They allege in a complaint that our policy had no per-accident limits and no per-person limits. Well, they don't. They do and they don't. I mean, that sentence that you just read from page 162, but you might as well have read it from page 165, doesn't say flatly there are no per-person limits. It says there are no per-person limits that do X. Of a certain type, right. Right. There's no follow-up that says there are of another type. It would be not an illogical thing to read into that a negative pregnant. The negative pregnant, however, is never stated. That lack of saying ever in the complaint that we have per-person limits is followed by failure to make any argument about per-person limits in their opposition. Even though we point out in our reply, we don't know what, in our moving papers, in our reply, we don't know what type of limits they're trying to say we have. They seem to try to say we have occurrence limits. Maybe we have accident limits. They're certainly focusing on the fact that there were two events and that we have no aggregate limit. They try to allege that. They don't make this argument. They don't cite the cases they cited in their brief to support the argument. They don't cite them even orally at the hearing to the trial court. At some point, these rules about waiver giving the trial court a fair chance, giving us a fair chance to flesh this out so we're not up here wasting everybody's time with, for the first time, a complete about-face in what is alleged. Well, I mean, this one is a plague on both your houses. I mean, you can't find the policy, or at least you haven't found the policy. She can't write English. What are we supposed to do? Well, you can do what the trial court did. And let's get to another point here, which is what they do allege about our policy, putting aside the per-accident versus per-person, is that we're an excess policy. And we are excess, meaning we do not attach until there is a liability in excess of $1 million. This liability, this settlement, was for $1 million, which doesn't reach our level. We don't pay until that underlying amount has been paid. That's the basis for the trial court's decision. Make that argument for me one more time, okay? I think I got it, but I want to make sure I got it. Our policy, which they allege in their complaint, is a follow-form excess liability policy. We have no duties, no duty to defend, no duty to indemnify, unless and until there is a liability for damages in excess of $1 million. Now, let me make the --" there's negative pregnancy in what you just said. Let me fill in the blank, as I understand the blank. This is --" we're all finished with the initial suit on behalf of the mom, Mercedez. Yes. We're now in a second suit with respect to wrongful death. On behalf of the survivors. I think the argument you just made is, well, because Lexington is an excess liability insurer, in order for the excess liability to be triggered, there has to have been liability in the underlying gulf policies for the wrongful death suit. And because the wrongful death suit didn't pay out, and they were not obligated to pay out, there can't be excess liability on something which they had no obligation to pay in the first place. Is that the argument? In part. In part, the argument is that our liability doesn't attach. We don't have any obligation to do anything about a case that is less than $1 million. If this underlying settlement had been $1.5 million, for example, it would have at least reached into our layer or potentially reached into our layer of coverage. There's an attachment point where our policy is triggered, where we may have duties. That limit, this is in the trial court's analysis as well, that limit is $1 million. If the settlement is only for $1 million, our duties were not yet triggered. The settlement was not within our layer of coverage. I see. I see. So whatever theory you want to give it per accident, per person, you don't have something that reaches the excess layer of coverage. And your argument then might be no excess because excess of $1 million. But what if there's no liability at all with respect from the Gulf insurers? I'll just lump them, call them the Gulf insurers. They don't cover the claim? They don't cover the claim. Right. Which is unlikely since, as it's alleged in the complaint, we're a follow-form excess policy, meaning we follow the provisions of the underlying policies. So you have to explain these terms. Follow-form means whatever is there in the underlying policies is. We follow, unless inconsistent. I don't know the exact language off the top of my head, but unless completely inconsistent with our provisions. A very familiar phrase to you, but not to me. And another point on the per-person argument, if we were to get to the merits of this complaint, they could allege per-person limits. They have never articulated how these per-person, our policy expired in October of 2005. Mrs. Paytok did not die, and this is also in the complaint, until March 20th, 2006. More than five months after our policy expired is when this new and separate and independent wrongful death came, arose. So they don't articulate how this would fall within our policy period.  I have to say, maybe you can correct me on this one, but that argument seems to me weak. If your client insured for wrongful death, I don't ask you to concede that, but then your client does something that inexorably leads to death, they do it within the policy period, but the death doesn't occur until after the policy period, I don't think you escape liability saying, well, she died later, or do you, when the wrongful act occurred during the time of the policy period. But it's the heirs' claim here. This is not a claim for her injuries. We settled that. Kagan. Wrongful death, I understand. That was my hypothetical view. Right. I don't think you can argue that you don't cover wrongful death when the wrongful act that caused the death was during the insured period, even though the death occurred after the expiration of the insured period, or do you? I think it makes a difference who's bringing the claim. And it might make a difference, actually, what the policy says. Oh, there, we're back to that. Yeah. Another point on the wrongful death claim is the policy covers bodily injury, and the heirs' claim in the case they cite for this is not for bodily injury. It's for financial losses as a result of the death, which are not covered under bodily injury in the policy. And they give the definition of bodily injury as bodily injury, sickness, or disease, and that would not cover these damages. So even if they could somehow come up with a basis for alleging per person  Injury to you doesn't include death. But the heirs don't recover for death. The heirs only recover for financial losses as a result of losing their mother. Okay. So their damages that they are entitled to in a wrongful death claim are not for bodily injury damages.  I think it would be pretty clear that, well, first of all, the trial court found there were one. We should be bound by that. But if there were two, then we have no obligation, because the second accident would be covered by the underlying policies, and you don't reach our policy. Okay. I'm going to do something that's a little unconventional. The ordinary deal is she goes first, you go second, then you're finished, and then she goes to rebut. We would like to hear her address the sort of we don't give a damn thing. We get to it because there's no excess, because it was only a million dollars. And it's possible she'll say something you may wish to respond to. So let's hear from the other side, and this is not necessarily the end for you. All right. Thank you. So what about this? There is no excess because this is only for a million dollars. Well, excess is not excess status for three reasons. The Gulf policy had combined single limits. That means it didn't have separate per person, separate per accident limits. It only had, the two Gulf policies only each had 500,000. So that when they exhausted by payment to Mercedes of $1 million, or it may have been 1.5, I forget whether those were 750 limits or 500 limits, but the two Gulf policies paid out their per accident limits. That means they have no more money for any further person involved in the accident. But that's exactly why Lexington's policy was structured the way it was, because then Lexington at that point has per person but no per accident limits. But then the argument from her side seems to me, but Lexington is an excess liability insurer, and it follows the same form as those policies, and this is not excess. This is somehow, this is an independent liability. This is not something for which the Gulf insurer is ever insured. In fact, that's wrong. In the complaint and excerpt of record at page 165, that they are follow form but not as to limits of liability, and that was expressly alleged, and that was expressly in the portion of the policy that I have. And as a result, they are not excess status over combined single limits, nor should it be public policy nor California law under the general order of the PUC that requires minimum per person limits of 750,000 for stagecoach operations. That's why this insurance program was structured the way it was. You had a situation where you would have the adequate per person limits that are required in order for personal protransportation to operate as a medical transporter, and you would have no per accident so that each person that was being transported would have those available limits. The second reason that Lexington is no longer excess is that the trial court's ruling held that both Gulf's policies were completely exhausted, the per person and the per accident. If Lexington wanted to challenge that ruling, it was Lexington's obligation to appeal from that ruling so that it could stand on its excess status. It did not do that. It accepted the trial court's ruling, as did the appellant's, that Gulf is completely exhausted by payment of the per accident limits, the maximum liability for any accident, to Mercedes Paycox. And the third reason that Lexington is excess is, as I stated, that at page 165 of the excerpt of record in the complaint, Lexington is not follow form as to limits. I also wanted to respond very quickly to the notion that the timing that one experiences a bodily injury is the trigger of coverage under an automobile liability policy. It is not. Under the insuring agreement as alleged in the complaint and as is standard in every automobile accident policy, the time that one experiences a bodily injury is the trigger. Okay. Any response? I'm just going to address briefly the reference. She was referring to the PUC provision, which she says somehow speaks to this. And first of all, they asked for judicial notice. We asked that the court deny that since they didn't raise the PUC provision below. But if you look at the PUC provision, it talks about mandatory limits. It just says limits. It doesn't say per person. It doesn't say aggregated or not aggregated. Of a certain amount, $750,000, there's no dispute here that this transportation carrier had $2 million of limits available to it. So that plays no part in the determination of whether we are or are not an excess policy. The complaint alleges we're excess, and it also alleges that our obligation is to pay a loss in excess of $1 million. That portion of a loss that exceeds $1 million, that's when we have an obligation to pay, not before. Okay. Thank you. Thank both sides. The case of Patok v. Lexington Insurance is now submitted for decision. That completes our argument calendar for this morning. We are now in adjournment. Thank you.
judges: Duffy, Noonan, Fletcher W.